IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| Plaintiff, | § § | Civil Action No. 3:15-CV-3157-D |
| VS. | § § § | *This memorandum opinion and order was filed under seal on June 14, 2017. It is being filed unsealed because the parties agree that no part of it needs to remain under seal. |
| ACCENTCARE INC., | § § § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

This is an action by plaintiff Equal Employment Opportunity Commission ("EEOC")

under Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101

*et seq.*, alleging that defendant AccentCare Inc. ("AccentCare") refused to reasonably

accommodate Alisia Beasley's ("Beasley's") disability (Bipolar Disorder) and discriminated

against her by terminating her employment because of her disability. AccentCare moves for

summary judgment. For the following reasons, the court grants the motion as to the EEOC's

discrimination claim and denies the motion as to the EEOC's reasonable accommodation

claim.

I

AccentCare provides home healthcare services, such as skilled home healthcare,

personal care, hospice care, private duty nursing, and case management.[1] AccentCare hired

_____

[1]In deciding this motion, the court views the evidence in the light most favorable to
the EEOC as the summary judgment nonmovant and draws all reasonable inferences in its

Beasley to work as an IT Help Desk Analyst, which required her to provide technical advice to the users of company hardware and software and troubleshoot IT problems. It is undisputed that Beasley has Bipolar Disorder.

AccentCare hired Beasley on April 24, 2013 as an at-will employee and informed her that her employment would begin with a 90-day probationary period. In June 2013 Beasley was absent from work for two full days, and left early three times, for reasons including illness and registering her daughter at school. On June 25, 2013 Beasley's supervisor, Dena Besh ("Besh"), orally counseled Beasley about her absences.

On Monday, July 8, 2013 Beasley began to suffer increased panic attacks, a symptom of Bipolar Disorder. That morning, Beasley emailed Besh that she would be absent from work that day, and possibly the next, to see her psychiatrist.

> Dena
>
> I will be out of the office today, I'm not sure if I'm going to be able to come in tomorrow. I'm needing to get in with my psychiatrist asap, as I've been out of meds for my Bipolar and adult ADHD disorders now for almost 2 weeks. I missed my appointment on June 26th, out of fear of l[o]sing my job because it was scheduled during my work hours.
>
> My doctor has very limited evening appointments which are booked months in advance, which is why I've been unable to see him after work. I've been trying to manage on my own, which has not worked.

---

favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

> I'm going to see if I can get in today or tomorrow to see him.
>
> Alisia Beasley

D. App. 48. This email was AccentCare's first notice that Beasley had Bipolar Disorder. Beasley emailed Besh again that night.

> I was able to see the doctor today, he has me off tomorrow so that I can have have some test done. As long as everything comes back normal I will be back on Wednesday.

*Id.* 52. According to notes taken that day by Beasley's psychiatrist, Shahzad S. Allawala, M.D. ("Dr. Allawala"), Beasley's symptoms included "irritability," "[m]otor restlessness associated with anxiety," and "difficulty in concentrating." D. Sealed App. 9. Dr. Allawala's notes do not, however, reflect that Beasley was to take time off work. They also do not specify any future appointments, other than to say "Return 2 weeks, or earlier if needed." *Id.* 10.

The next morning, Tuesday, July 9, 2013, Beasley emailed Kimberly Nelson ("Nelson"), a Human Resources Operations Manager at AccentCare.

> Kim,
>
> Due to medical conditions I will be out of office for an extended amount of time. As of now my doctor has not provided me with a return to work date. I understand that I am not eligible for FMLA, however I am unsure if I'm eligible for another type of leave or short term disability. Will you please tell me what my options are?
>
> Alisia Beasley

D. App. 53. Beasley also emailed Besh on July 9.

- 3 -

My doctor has taken me off work for an extended amount of time, he has not provided me with a return to work date.

*Id.* 56.

Nelson emailed Beasley to request to speak by phone. Beasley telephoned Nelson and recorded the call. Nelson informed Beasley that AccentCare could not grant her a leave of absence, and intended to separate her from employment based on her not being able to return to work. The transcript of the conversation then reflects the following exchange:

| | |
|---|---|
| Beasley: | Okay so essentially because I have a medical condition and am not able to return to work you all are firing me. |
| Nelson: | Well we can't, uh, we don't have, as I told you . . . since you're not covered under FMLA and there's not really a medical leave available for employees who've been here such a short time . . . |
| Beasley: | Mmmhm |
| Nelson: | . . . the only other option was a personal leave, and . . . based on the needs of the position, um, and needing to have someone in that . . . role, we, we can't, you know, just leave it open indefinitely. |
| Beasley: | Okay, I'm not asking you all to leave it open indefinitely. As far as . . . as far as I know, may be able to come back to work on Friday. I have a follow-up visit with my doctor on Friday, and so I don't know if I'm gonna to be able to come back to work on Friday or if it's going to be a month from now. But essentially it still falls back to that because I have a medical condition that's stopping me from coming to work today then you all are firing me. |
| Nelson: | No . . . it—It's that within the first 90 days of your employment, you've indicated that you're—you need to be out indefinitely and we are not in a position to hold a position open indefinitely. |

- 4 -

| | |
|---|---|
| Beasley: | I haven't said indefinitely, though. I haven't given you all a time frame. As I stated, I go back to the doctor on Friday . . . |
| Nelson: | Okay, you're . . . |
| Beasley: | . . . and so regardless of if I'm within my [talking over one another] |
| Nelson: | . . . your email to me earlier, Alisia, was that you didn't know when you would be able to return to work. |
| Beasley: | Correct, and I go back to the doctor on Friday. |
| Nelson: | So I consider that to be indefinitely. |
| Beasley: | Well no, I go back to the doctor on Friday, and when I go back to the doctor on Friday he can either release me or he can extend it. But one way or the other, regardless if I'm within 90 days or if I'm there a year, you all have the right to let me go whenever because we are . . . in an at-will state. But I'm not . . . |
| Nelson: | Uh-huh |
| Beasley: | . . . but I'm not letting you all know that I'm—that I'm not going to come back at all. All I'm saying is, as of today, my doctor has me off, I go back to work on Monday. I'm sorry, I mean I go back to the doctor on Friday because he put me on medication to see if the medication has helped stabilize me. And if . . . |
| Nelson: | Ok |
| Beasley: | . . . it has, then I will be released to return to work. |
| Nelson: | Ok, So, um, you [inaudible] you go to the doctor on Friday . . . |
| Beasley: | Uh-huh |
| Nelson: | . . . and then when would you be able to get back to us? |
| Beasley: | if he releases me on Friday, then I'll be back in the office on Monday. Um, you know, just as I . . . |
| Nelson: | I mean, what time . . . [inaudible] you know what time you could give us a call . . . would you expect to hear back from you on Friday? |
| Beasley: | Oh, yes. Oh my appointment on Friday is, is at 11 |

|   |   |
|---|---|
| | a.m. |
| Nelson: | Okay. |
| Beasley: | And so right after I leave my doctor's appointment I could call you all and let you know. Um . . . |
| Nelson: | Okay |
| Beasley: | . . . what his decision is. But, if either way you all are gonna let me go, then . . . versus . . . I guess my thing is versus waiting until Friday and then telling me "Well we're gonna still separate you," then I would prefer for you all to tell me that today, so that way I know what my next course of action is versus waiting until Friday and then telling me "Well, because you've missed this amount of time we're gonna let you go because you're within your 90 days." |
| Nelson: | Mmmhm . . . right, ok. Alright well I'm gonna have to talk to um, to Dena and let her know there's a possibility that you would be released Friday to come back Monday because she . . . she didn't have that information she just knew that—when I talked to her, that you were [inaudible] you'd only indicated that you would need to be out yesterday and today and you didn't . . . you didn't tell her . . . specifically, you know, that you might need to be out longer, so . . . . |
| Beasley: | Ok, well she never responded to my emails though, or my phone call, um, until probably about nine o'clock last night and then all she said was "Okay." She didn't say anything else to me, or whether or not she had a question, or whatever. And so . . . I mean that's why I . . . |
| Nelson: | But I think . . . |
| Beasley: | . . . that's why I contacted you |
| Nelson: | . . . that what she told me was what she got from you is that you'd be out for a couple of days. She didn't have the information that you provided me, which was, uh, today that you didn't know when you'd be able to return to work. |
| Beasley: | Well I did send her . . . |
| Nelson: | So . . . . |

- 6 -

| | |
|---|---|
| Beasley: | . . . an email, so I have a copy of that email where I did email her, I sent her two emails yesterday, and called her yesterday, and then I sent her an email again this morning. Um, either way though, If you could just let me know if you all are still going to let me go regardless if my doctor releases me or not on Friday, then if you can let me know that as soon as you find out versus me waiting until Friday and then calling you all and saying, "Hey well my doctor released me, can I come back to work on Monday?" . . . |
| Nelson: | Uh-huh |
| Beasley: | . . . and then I'm being told "No." |
| Nelson: | Ok. |
| | [ . . . ] |
| Nelson: | Ok Alisia. Um, either I or Dena will be back in touch with you. |
| Beasley: | Ok, thank you very much. |

D. App. 59-61 (brackets and ellipses in original, except that the final ellipsis within brackets indicates the omitted exchange of telephone number information). In a second phone call on the same day, Nelson and Besh informed Beasley that AccentCare was terminating her employment.

Beasley filed a charge of discrimination with the EEOC, alleging that AccentCare had denied her a reasonable accommodation for her disability and had discriminated against her on the basis of her disability. AccentCare did not reach a conciliation agreement with the EEOC, the EEOC filed this lawsuit, and AccentCare moved for summary judgment.

In its response brief, the EEOC requested relief under Fed. R. Civ. P. 56(d) so that it could depose AccentCare witnesses, including Besh. AccentCare moved to quash Besh's deposition, but the magistrate judge denied the motion. The court permitted the EEOC to file

a supplemental brief incorporating evidence from Besh's deposition, and it permitted AccentCare to file a supplemental reply brief. In deciding AccentCare's summary judgment motion, the court has considered the initial briefing and evidence, the supplemental briefing and evidence, and the briefing on AccentCare's objections to summary judgment evidence.

## II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond its pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

## III

As a threshold matter, the court addresses AccentCare's objections to some of the EEOC's summary judgment evidence. In objections 1, 4, and 31, AccentCare contends that

a pharmacy record offered by EEOC is hearsay and not properly authenticated. The court overrules these objections as moot, because the court does not rely on the pharmacy record in this opinion.

In objections 2, 3, 5-9, 12-25, and 27-29, AccentCare contends that Beasley's recounting of her doctor's instructions is inadmissible hearsay. The court sustains these objections. *See* Fed R. Evid. 801(c) (defining "hearsay"); *Murray v. Red Kap Indus., Inc.*, 124 F.3d 695, 698 (5th Cir. 1997) (holding that plaintiff's testimony about her doctor's instructions was "immaterial, conclusory, and/or hearsay"); *see also Stull v. Fuqua Indus., Inc.*, 906 F.2d 1271, 1273-74 (8th Cir. 1990) (holding that "statement for the purpose of obtaining medical diagnosis or treatment" hearsay exception applies only to statements made by person seeking treatment, or special relationship such as parent).

In objections 10, 11, and 26, AccentCare contends that the EEOC is judicially estopped from offering evidence to contradict a fact that is alleged in its pleading. AccentCare posits that, according to the EEOC's complaint, "Beasley informed her supervisor that she had seen her psychiatrist who took her off for an indefinite period of time," Compl. ¶ 15, and the EEOC is therefore estopped from offering evidence that Beasley represented her required time off to be something less than "indefinite." The court sustains the objection in part. Unless and until the EEOC amends its complaint to change this allegation,[2] the EEOC may not contradict its judicial admission that Beasley informed her

---

[2]"Admissions made in superseded pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions." *White v.*

supervisor that she had seen her psychiatrist, who took her off for an indefinite period of time. *See, e.g.*, *State Farm Fire & Cas. Co. v. Flowers*, 854 F.3d 842, 845 (5th Cir. 2017) (holding that factual statements in pleadings are judicially admitted). But the court overrules the objection to the extent that AccentCare seeks to preclude the EEOC from offering evidence of Beasley's other statements on the topic, some of which are also alleged in the complaint. *See* Compl. ¶ 15 ("Later, Ms. Beasley told the company that she might be able to return to work as early as her July 12 doctor's appointment."). AccentCare has failed to demonstrate that any such evidence would run counter to a binding judicial admission found in the complaint.

In objection 30, AccentCare contends that the EEOC Charge of Discrimination is hearsay. The court overrules this objection as moot, because the court does not rely on the Charge of Discrimination in this opinion.

In objections 32-43, AccentCare challenges portions of the EEOC's brief rather than the summary judgment evidence. The court overrules these objections as moot given that case law governs the admissibility of unsworn factual assertions made in the summary judgment briefing. *See, e.g., Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991) ("Unsworn pleadings, memoranda, or the like are not, of course, competent summary judgment evidence."). It is therefore unnecessary to consider objections to the contents of briefing that are made under the Federal Rules of Evidence.

---

*ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 n.5 (5th Cir. 1983); *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 939 F. Supp. 533, 541 (N.D. Tex. 1996) (Fitzwater, J.).

IV

The court now considers the EEOC's claim that AccentCare refused to grant a reasonable accommodation for Beasley's disability.

A

The ADA prohibits discrimination in employment against a qualified individual on the basis of her disability. 42 U.S.C. § 12112(a). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id*. § 12112(b)(5)(A). To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (footnote and internal quotation marks omitted). A "qualified individual" is one who can perform the essential functions of the employment position, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

B

AccentCare contends that no evidence supports any element of the EEOC's claim. As an initial matter, AccentCare contends that Beasley was not an "otherwise qualified individual," within the meaning of the statute, because the EEOC has not offered evidence

to show that Beasley needed an accommodation (i.e., additional leave time) to perform her job. *See, e.g.*, *Brumfield v. City of Chicago*, 735 F.3d 619, 632 (7th Cir. 2013) ("[A]n employer's accommodation duty is triggered only in situations where an individual who is qualified on paper requires an accommodation in order to be able to perform the essential functions of the job."). AccentCare maintains that the EEOC has no competent summary judgment evidence showing that Beasley's physician instructed her not to work.

AccentCare next contends that there is no evidence to support the first element of the claim—that Beasley was a qualified individual with a disability. AccentCare posits that, because the EEOC alleges that Beasley needed an indefinite leave of absence for the treatment of Bipolar Disorder, Beasley was not qualified to perform her job, because regular attendance at work was an essential function of the job. *See Hypes ex rel Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) ("[R]egular attendance is an essential function of most jobs."). AccentCare also maintains that there is no evidence that Beasley was ever cleared to return to work, which likewise suggests that she was not qualified to perform her job going forward.

AccentCare also contends that there is no evidence to support the second element of the claim—that AccentCare knew of a consequential limitation of Beasley's disability—because the EEOC has not submitted proof that Dr. Allawala instructed Beasley to stop working. And AccentCare contends that there is no evidence of the third element—failure to make a reasonable accommodation—because Beasley's request for indefinite leave was not a reasonable accommodation. *See Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d

476, 481 (5th Cir. 2016) ("[A]n employer is not required to provide a disabled employee with indefinite leave.").  Finally, AccentCare contends that the EEOC has no evidence of damages from a failure to accommodate because there is no evidence that shows that Beasley would ever have been cleared to return to work.

The EEOC responds that there are genuine issues of fact concerning each element. It contends that proof of a medical determination is not required because an employee's request (which the EEOC maintains that Beasley made) is alone sufficient to obligate the employer to engage in an interactive process to decide how to accommodate the disability.

As to the first element of the claim, the EEOC maintains that Beasley's mention of indefinite leave does not negate her qualification for the job because she soon clarified that she would have more information after her Friday doctor's appointment.  The EEOC posits that, when the employer has reason to expect that a finite leave may suffice, but is not yet certain whether the employee may return to work, the employer may not preemptively terminate the employee before the situation is clarified.  With regard to the second element of the claim, the EEOC appears to contend that Beasley's request for leave gave AccentCare the required notice of a consequential limitation of her Bipolar Disorder.  And with regard to the third element, the EEOC seems to contend that, upon clarification during the telephone call with Nelson, AccentCare knew that Beasley was not asking for an indefinite leave, but rather for a few days' leave in which to clarify whether she could return to work.

C

The court concludes that there is a genuine issue of material fact as to each element of the EEOC's reasonable accommodation claim.

As noted above, a "qualified individual" is one who can perform the essential functions of the employment position, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8). The Fifth Circuit adheres to a two-tiered analysis for determining whether a person is "qualified" under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993).

The EEOC has presented sufficient evidence for a reasonable jury to find that, because of her Bipolar Disorder, Beasley could not have performed the essential functions of the job of IT Help Desk Analyst without a reasonable accommodation. The EEOC's evidence on this point includes the diagnosis itself, the symptoms identified in Dr. Allawala's notes, and Beasley's statements to AccentCare that she needed medication.

As for AccentCare's contentions that Beasley was not qualified because she needed an indefinite leave of absence, and that there is no evidence that Beasley was ever cleared to return to work, the EEOC has presented evidence that would enable a reasonable jury to find that, in Beasley's communications with AccentCare, she was actually requesting a few

days of leave rather than indefinite leave, and that AccentCare terminated her employment before acting on her leave request. *Cf. Cutrera v. Bd. of Supervisors of La. State. Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended.").

The EEOC has also introduced sufficient evidence to create genuine issues of material fact on the second and third elements of its reasonable accommodation claim.[3] A reasonable jury could find that Beasley informed AccentCare of her disability and of its consequential limitations, and that AccentCare terminated Beasley's employment rather than reasonably accommodate her known limitations.

Nor is AccentCare entitled to summary judgment based on its contention that the EEOC cannot show that Beasley was damaged in the absence of evidence that she was ever cleared to work again. The EEOC seeks both damages and injunctive relief, and AccentCare identifies no controlling authority holding that damages are an essential element of a reasonable accommodation claim.

Accordingly, the court denies AccentCare's motion for summary judgment addressed to the EEOC's failure-to-accommodate claim.

---

[3]"When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact." *Valcho v. Dall. Cnty. Hosp. Dist.*, 658 F.Supp.2d 802, 812 n.8 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.)).

V

The court now turns to the EEOC's claim that AccentCare violated the ADA by discriminating against Beasley based on her disability.

A

Because the EEOC relies on circumstantial evidence to support its ADA discrimination claim, the claim is properly analyzed under the *McDonnell Douglas*[4] burden shifting framework. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999) (holding that *McDonnell Douglas* framework, which is used in cases brought under Title VII, applies to ADA cases when only circumstantial evidence of discrimination is offered). As modified, the *McDonnell Douglas* framework consists of three stages. First, the EEOC must establish a prima facie case of discrimination, which "creates a presumption that [AccentCare] unlawfully discriminated against [Beasley]." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). To establish a prima facie case of discrimination based on a disability under the ADA, the EEOC must show that (1) Beasley had a disability, (2) she was qualified for the job, and (3) there was a causal connection between an adverse employment action and her disability.[5] *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (citing *EEOC*

---

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[5]There is "a discrepancy in the Fifth Circuit's cases evaluating the requisite nexus between an employee's disability and her termination." *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 695 (5th Cir. 2014). In *LHC Group* the Fifth Circuit held that, "'[t]o establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability.'" *Id.* at 697 (brackets omitted) (quoting *Zenor v. El*

*v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014)).

Second, if the EEOC establishes a prima facie case, the burden shifts to AccentCare to articulate a legitimate, nondiscriminatory reason for the employment action taken against Beasley. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). AccentCare's burden is one of production, not proof, and involves no credibility assessments. *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003). This "burden requires the production of admissible evidence in support of its nondiscriminatory reasons." *Hervey v. Miss. Dep't of Educ.*, 404 Fed. Appx. 865, 868 (5th Cir. 2010) (per curiam) (citing *Burdine*, 450 U.S. at 255).

Third, if AccentCare meets its production burden by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action, "the presumption of discrimination created by [the EEOC's] prima facie case disappears," *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005), and "the burden shifts back to [the EEOC] to make an ultimate showing of intentional discrimination," *Campbell v. Zayo Grp.*, LLC, 2015 WL 3903539, at *3 (N.D. Tex. June 25, 2015) (Fitzwater, J.) (quoting *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012)). The EEOC must show that the legitimate,

---

*Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)); *but see, e.g., McCollum v. Puckett Mach. Co.*, 628 Fed. Appx. 225, 229-30 (5th Cir. 2015) (per curiam) (holding that a plaintiff must show: "(1) [h]e is disabled, (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability and (4) he was replaced by or treated less favorably than non-disabled employees."). Although AccentCare cites some examples of the disputed fourth element, the court follows the *LHC Group* formulation, for the reasons set out in that case. *See LHC Grp.*, 773 F.3d at 695-96.

nondiscriminatory reason proffered by AccentCare "[is] not its true reason[], but [was] a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).[6] Therefore, to survive summary judgment, the EEOC must "offer sufficient evidence to create a genuine issue of material fact . . . that [AccentCare's] reason is not true, but is instead a pretext for discrimination." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citation and internal quotation marks omitted) (describing standard in context of age discrimination case). At the summary judgment stage, of course, the EEOC is only obligated to raise a genuine issue of material fact regarding pretext. *See, e.g., Jackson v. Fed. Express Corp.*, 2006 WL 680471, at *6 (N.D. Tex. Mar. 14, 2006) (Fitzwater, J.) ("Because [defendant] has satisfied its burden to produce a legitimate, nondiscriminatory reason for [plaintiff's] discharge, in order for [plaintiff] to survive summary judgment, [s]he must create a genuine and material fact issue regarding the ultimate question of discrimination.").

These three steps constitute the *McDonnell Douglas* framework. "Although

---

[6]As this court has previously observed, it is unclear whether the mixed-motives alternative to rebutting a defendant-employer's proffered legitimate reason is still viable in ADA discrimination cases after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009) (holding that mixed-motives theory is unavailable under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq.). *See Thomas v. Greystar Mgmt. Servs., L.P.*, 2014 WL 2519165, at *3 n.4 (N.D. Tex. June 4, 2014) (Fitzwater, C.J.). The court need not decide whether the mixed-motives theory is available here, because the EEOC has only attempted to show that AccentCare's proffered legitimate, nondiscriminatory reason is pretextual.

intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143 (alteration in original) (quoting *Burdine*, 450 U.S. at 253).

B

Because the court holds below that the EEOC has failed to meet its burden to create a genuine issue of material fact on the issue of pretext, it will assume *arguendo* that the EEOC has established a prima facie case.

C

The court now turns to the second stage and determines whether AccentCare has met its burden of production. AccentCare has met this burden because its evidence shows that it had a legitimate, nonpretextual reason for terminating Beasley's employment.

According to AccentCare's evidence, it terminated Beasley because of her unplanned absence on July 8, 2013, combined with her previous absence record and the fact that she was within the 90-day probationary employment period. Her job required that she be present at work, but she had already been absent several times in fewer than 90 days on the job. In the case of her July 8, 2013 absence—the day before she was terminated—she was absent for the entire day, and did not give AccentCare notice of the absence until after the time when she should have reported for work that morning. And in the conversations with AccentCare of July 8 and 9, Beasley could not say definitely when she would return to work, other than that she had a doctor's appointment that Friday. Terminating an employee for

- 19 -

poor attendance is a legitimate, nonpretextual reason.  *See Delaval*, 824 F.3d at 480.

D

1

Because AccentCare has met its burden of production, the burden shifts back to the EEOC to present evidence that would enable a reasonable jury to find that AccentCare's reason is pretextual.

AccentCare posits that when an employee notifies her employer of an indefinite absence, coupled with an upcoming doctor appointment that may or may not release the employee to return to work, termination is a legitimate, nondiscriminatory response.  *See Owens v. Calhoun Cty. Sch. Dist.*, 546 Fed. Appx. 445, 448-49 (5th Cir. 2013) (per curiam). AccentCare also contends that Beasley's subjective belief that she was discharged because of her disability is not sufficient to raise a fact issue as to pretext.  *See Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997).  And AccentCare maintains that temporal proximity is insufficient to show pretext, *see Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 487 (5th Cir. 2008), and that the EEOC may not second-guess a business judgment decision.

The EEOC responds that AccentCare's proffered reason is pretextual because AccentCare is exaggerating the length of Beasley's anticipated absence, as discussed on July 8-9, 2013.  The EEOC points to the telephone call between Beasley and Nelson, in which Beasley explained, "I'm not asking you all to leave it open indefinitely. As far as . . . as far as I know, may be able to come back to work on Friday.  I have a follow-up visit with my

- 20 -

doctor on Friday[.]" D. App. 59. The EEOC contends that AccentCare rushed to terminate Beasley (as evidenced by Nelson's originally agreeing to wait for the Friday appointment, then calling back the same day to terminate Beasley), which suggests that AccentCare's reason is pretextual. And the EEOC maintains that the ADA's protections apply equally to probationary employees.

The court concludes that no reasonable jury could find that AccentCare's reason for firing Beasley is pretextual. Beasley's assertion that she hoped to return to work after her Friday doctor appointment does not undermine AccentCare's reason for terminating her employment. This is so because, even accepting Beasley's assertion as true, she had just added two full days' absences (July 8 and 9), with little to no notice, to her numerous previous absences. Additionally, a forthcoming doctor appointment, without certainty of returning to work, is not sufficient to establish that an employee expects to return to work. *See Owens*, 546 Fed. Appx. at 448-49. The *Owens* panel held that the employer had a legitimate, nonpretextual reason for terminating the employee. *See id.* Finally, the close temporal proximity of Beasley's termination to AccentCare's initial notice that she had Bipolar Disorder, standing alone, cannot establish pretext. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) ("Timing standing alone is not sufficient absent other evidence of pretext." (internal quotation marks omitted)).

Accordingly, the court holds that AccentCare is entitled to summary judgment dismissing the EEOC's discrimination claim.

The result of today's ruling may seem facially inconsistent: the court is in effect holding that the EEOC may be able to recover at trial based on AccentCare's failure to reasonably accommodate Beasley's disability, but it is also holding that the EEOC cannot withstand summary judgment on its claim that AccentCare discriminated against Beasley based on her disability by terminating her employment. These rulings are not irreconcilable, however, because of differences in the proof burdens that apply to each.

For example, when the First Circuit (like this circuit) declined to apply the *McDonnell Douglas* burden-shifting regime to a reasonable accommodation claim, it distinguished what must be proved for an ADA reasonable accommodation claim from an ADA discrimination claim:

> Unlike other enumerated constructions of "discriminate," this construction does not require that an employer's action be motivated by a discriminatory animus directed at the disability. Rather, any failure to provide reasonable accommodations for a disability is necessarily "because of a disability"—the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability—and no proof of a particularized discriminatory animus is exigible. Hence, an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business. It follows inexorably that the *McDonnell Douglas* scheme is inapposite in respect to such claims.

*Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999) (citations omitted). The Fifth Circuit has also observed the distinction between a reasonable

accommodation claim and other discrimination statutes (from which the *McDonnell Douglas* framework originates):

> The ADA mandate that employers must accommodate sets it apart from most other anti-discrimination legislation. Race discrimination statutes mandate equality of treatment, in most cases prohibiting consideration of race in any employment decision. In contrast, an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA. By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities.

*Riel v. Elec. Data Sys. Corp.*, 99 F.3d 678, 681 (5th Cir. 1996).

These authorities help explain why in the same case a termination-based disability discrimination claim can fail while a claim that the employer failed to reasonably accommodate a disability can succeed. And the fact that an employee was terminated would not necessarily stand as an insuperable impediment to her reasonable accommodation claim because the trier of fact might find that, had the employer reasonably accommodated the employee's disability, she would not have been terminated when she was for the reason she was.

\*     \*     \*

Accordingly, for the reasons explained, the court grants AccentCare's motion for summary judgment as to the EEOC's discrimination claim and denies it as to the EEOC's claim that AccentCare failed to reasonably accommodate Beasley's disability.

**SO ORDERED**.

June 14, 2017.

_____

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE